IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:15-MJ-611 |
| SAMUEL DENNIS NIIARYEE, ) | |
| ) | |
| Defendant. ) | |

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT AND A CRIMINAL COMPLAINT

### I. IDENTITY OF THE AFFIANT

I, Charles B. Doughty, being duly sworn, state:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since March 2005. I am assigned to a white collar crime squad at the Washington Field Office, Northern Virginia Resident Agency, Manassas, Virginia, and have been so assigned since December 5, 2011. The squad specializes in the investigation of health care fraud offenses including pharmaceutical drug diversion and distribution committed in Northern Virginia.

### II. REASON FOR AFFIDAVIT

2. This affidavit is made in support of a criminal complaint and arrest warrant for defendant SAMUEL DENNIS NIIARYEE.

3. The criminal complaint charges the defendant with conspiracy to distribute a mixture or substance containing a detectable amount of oxycodone, also known as "OxyContin," "Oxy," "Roxicodone" and "Roxi," a Schedule II controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846, from 2009 until approximately May 2015.

1

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, as well as the observations of other law enforcement officers involved in this investigation. All observations that were not personally made by me were related to me by the person(s) who made such observations.

5. This affidavit contains the information necessary to support probable cause for these applications. The affidavit is not intended to and does not include each and every fact and matter observed by me or known to the government.

6. Through knowledge gathered from previous investigations and information that I have gathered through reading about oxycodone, I have learned that oxycodone is a commercially available, pharmaceutical narcotic analgesic that can be used to treat moderate to severe pain. Oxycodone is classified by the Drug Enforcement Administration as a Schedule II controlled substance. A Schedule II controlled substance is identified as one that has a valid medical application but also has a high likelihood of causing addiction. Oxycodone is the active ingredient in OxyContin and Roxicodone.

### III. INVESTIGATION

7. In or about May 2015, a Prince William County Police Department (PWCPD) Detective working on the Fairfax Criminal Intelligence Unit notified your affiant regarding NIIARYEE and advised that the Detective had conducted multiple controlled purchases of oxycodone 30 mg tablets from NIIARYEE, between February and April 2015, using a confidential informant (referred to below as CI-2) as well as an undercover law enforcement employee. The Fairfax County Police Department (FCPD) arrested NIIARYEE as a result of the activities Fairfax Criminal Intelligence Unit had documented through their investigation. Upon NIIARYEE's bond-secured release from detention, in or about May 2015, he subsequently filled

a prescription for oxycodone 30 mg tablets and sold the oxycodone tablets to another FCPD undercover law enforcement employee in a controlled purchase brokered by another FCPD confidential informant (referred to below as CI-1). FCPD arrested NIIARYEE as a result of the activities they documented in their investigation; in September 2015, the charges stemming therefrom were *nolle prossed.*

8. As described below, investigation has revealed that NIIARYEE began distributing oxycodone tablets at least as early as in approximately 2009.

### CI-1

9. On or about September 15, 2015 your affiant and FBI Special Agent Shane Dana interviewed an FBI confidential informant (CI-1).[1] CI-1 stated that he met NIIARYEE around 2007-2008. CI-1 was introduced to NIIARYEE through a mutual associate, referred to in this affidavit as "K," who was selling OxyContin tablets to CI-1. A portion of the pills K was selling to CI-1 came from NIIARYEE. K was arrested by the local police department in 2008, so CI-1 used a pill bottle he had purchased from K that still had part of NIIARYEE's name on the label to conduct an online search for NIIARYEE and discover his phone number.

10. CI-1 contacted NIIARYEE in 2008 and told him that he was the person purchasing the OxyContin tablets from K. Since K was now in jail, CI-1 proposed that NIIARYEE just sell his pills directly to CI-1. NIIARYEE agreed based upon the condition that CI-1 purchase the entire prescription. NIIARYEE told CI-1 that if he had trouble raising the money, CI-1 could

---

1. CI-1 is an FBI cooperating witness whose reporting has been corroborated from other investigative information and is assessed to be reliable. CI-1 has not been compensated or promised any benefit by the FBI. Local law enforcement has charged CI-1 with one count of distribution of a Schedule I/II controlled substance; the charge has been continued pending lab analysis and CI-1 is currently on probation. Local law enforcement is aware that CI-1 is cooperating with the FBI.

gather people who also want to purchase the pills and they could pool their money in order to buy the whole prescription at once, but NIIARYEE only wanted to deal with CI-1 and no one else. NIIARYEE went on to counsel CI-1 that he should only consume one or two of the oxycodone tablets and not become addicted; that way CI-1 could sell the vast majority of the prescription and both he and NIIARYEE would make more money.

11. Starting in 2008, CI-1 initially bought OxyContin 80 mg tablets from NIIARYEE. CI-1 would initially buy 90 tablets (and later 60 tablets) for $2,000 per month. In 2010, the manufacturing formula for OxyContin 80 mg tablets changed to include additives that prevented abuse. Once the OxyContin manufacturing companies began manufacturing OxyContin 80 mg tablets with the anti-abuse additives, NIIARYE and CI-1 searched for pharmacies that were still selling the old formula. Once they ran out of the old-formula OxyContin 80 mg tablets, CI-1 informed NIIARYEE that the new OxyContin 80 mg tablets were useless to him. NIIARYEE asked CI-1 what type of pills he would purchase, and CI-1 replied that oxycodone 30 mg tablets were now in high demand.[2] NIIARYEE told CI-1 that he informed his physician that the new OxyContin 80 mg tablets were not adequately addressing his pain, and the physician began prescribing him oxycodone 30 mg tablets.

12. CI-1 continued purchasing NIIARYEE's oxycodone medication each month from approximately 2010 to mid-2012. CI-1 would pay $1,800 per month for 180 oxycodone 30 mg tablets. CI-1 estimates that he made a total of eighteen (18) oxycodone purchases during this period before he enrolled himself in a rehabilitation clinic in Florida in mid-2012. NIIARYEE

---

2. Based on my experience and prior investigations, I have determined that Oxycodone 30 mg tablets quickly became the drug of choice for opiate abusers when OxyContin began manufacturing their tablets with tamper-proof additives at the 80 mg level in 2010. The 30 mg tablets became the largest dosage that does not contain additives that prevent abuse.

kept asking CI-1 to continue buying the pills from him while CI-1 was in rehab. CI-1 introduced an individual referred to in this affidavit as "C" to NIIARYEE and told him that he could purchase the pills instead of CI-1. C purchased pills three or four times from NIIARYEE but he ended up robbing NIIARYEE. While CI-1 was in rehab, he relapsed and was put into a halfway house in mid-2012. NIIARYEE mailed oxycodone to CI-1 in the halfway house on two occasions. CI-1 told NIIARYEE that he (CI-1) received money from an insurance settlement and could send NIIARYEE approximately $800 for the first shipment of pills NIIARYEE had mailed to Florida. NIIARYEE complained that this was not enough and that he should just keep it until he can sell the pills and send him all of the money owed. NIIARYEE mailed a second (and final) shipment of pills to CI-1 before CI-1 could pay for the first shipment. CI-1 never reimbursed NIIARYEE for either shipment.

## CI-2

13. As of mid-2012, NIIARYEE wanted CI-1 to continuing purchasing his prescription each month. Since CI-1 was in rehab, he introduced NIIARYEE to another FBI confidential informant (CI-2).[3] CI-2 reported that he began making monthly purchases from NIIARYEE while CI-1 was still in rehab in Florida (assessed by the FBI to be in or about June 2012), for approximately 10 months. CI-2 would drive to NIIARYEE's residence to purchase his prescription. He would typically park in the driveway and walk into NIIARYEE's garage and sit in the room just behind the garage. CI-2 would buy oxycodone 30 mg tablets for $10 each. CI-2

---

3. CI-2 is an FBI cooperating witness whose reporting has been corroborated from other investigative information and is assessed to be reliable. CI-2 has not been compensated or promised any benefit by the FBI. In May 2015, CI-2 pled guilty to distribution of a Schedule I/II controlled substance, possession with intent to distribute a Schedule I/II controlled substance, and simultaneous possession of a Schedule I/II controlled substance and a firearm; he is awaiting sentencing and is currently free on bond. Local law enforcement is aware that CI-2 is cooperating with the FBI.

recalled NIIARYEE getting drug screened by his physician and eventually being referred to another physician because none of the oxycodone was present in his drug screen since NIIARYEE did not take any of the medication. NIIARYEE began getting another prescription from a different physician. NIIARYEE was getting 150 tablets each month and he would sell all of them except one which he kept in order to consume just before going back to the doctor to get his next prescription. By saving one pill, NIIARYEE would ensure that he would have oxycodone present in his system if he were to be drug screened again. According to CI-2, NIIARYEE hated taking oxycodone because it made him feel sick, so CI-2 instructed him to just take a portion of the pill.

## **PRINCE WILLIAM COUNTY UNDERCOVER EMPLOYEE**

14. On or about February 5, 2015, Prince William County Police Department Officer acting in an undercover capacity (UCE-1) along with CI-2 conducted a controlled purchase of oxycodone tablets from NIIARYEE in the Alexandria, Virginia area. Prior to the purchase, NIIARYEE called CI-2 on a cellular telephone to request that the meeting location be changed. At the purchase, NIIARYEE met UCE-1 and CI-2 inside of UCE-1's vehicle where he exchanged a prescription bottle of 149 oxycodone tablets (30 mg) for $2,000.

15. On or about March 3, 2015, UCE-1 contacted NIIARYEE via text message and arranged another purchase of oxycodone. NIIARYEE responded via text message and confirmed that he would meet for another transaction. Specifically, NIIARYEE stated: "Yes, will call you when I am ready for you ok". On or about March 5, 2015, NIIARYEE followed up with another text message stating, "Is the weather too bad for you? Will you be able to see me today? If yes let me know… It's ready for here in the house. Call me when you are coming. See you then."

UCE-1 and NIIARYEE eventually met on or about March 6, 2015 in the Centreville, Virginia area. Once again NIIARYEE entered UCE-1's vehicle and handed UCE-1 a prescription bottle with no label on it. UCE-1 handed NIIARYEE $1,900. NIIARYEE explained to UCE-1 that there were 149 oxycodone tablets (30 mg) in the bottle because he keeps one pill to consume before returning to his physician's office in case he is drug screened at his physician's office.

16. On or about April 10, 2015, UCE-1 conducted another controlled purchase of oxycodone from NIIARYEE in the vicinity of NIIARYEE's residence in Alexandria, Virginia. Prior to this purchase, between March 30, 2015 and April 7, 2015, NIIARYEE and UCE-1 discussed plans to meet to conduct the purchase. For example, on April 6, 2015, NIIARYEE sent a text message stating, "I hope you made it safe back. The box is sitting hear [sic] waiting for you. ...Let me know when." The following day on April 7, 2015, NIIARYEE again contacted UCE-1, stating in a text message, "I hope we do this on Thursday because it's fucking my banking up with an outstanding obligations. [sic] Early ok." Then on April 8, 2015, NIIARYEE sent UCE-1 a text message stating, "I just want to know if we are on tomorrow. If not let me know. I am on a verge of defaulting on my account. I have to do something soon." On April 10, 2015, NIIARYEE met UCE-1 for the purchase. NIIARYEE got into UCE-1's vehicle when UCE-1 pulled up to NIIARYEE's residence. After driving a short distance from the residence, NIIARYEE handed UCE-1 a prescription bottle containing 149 oxycodone tablets (30 mg). UCE-1 handed NIIARYEE $2,000. After the transaction was completed, officers from the Fairfax Criminal Intelligence Unit took NIIARYEE into custody. NIIARYEE posted bond on or about April 10, 2015.

## FAIRFAX COUNTY POLICE DEPARTMENT UNDERCOVER EMPLOYEE

17. On or about May 6, 2015 Fairfax County Police Department Detective acting in an undercover capacity (UCE-2) conducted a controlled purchase operation on NIIARYEE in Alexandria, Virginia. UCE-2 and CI-1 drove to a Giant Food store in Alexandria, Virginia where they identified NIIARYEE sitting in his car along the fire lane in front of the store. UCE-2 parked his car in the lot and NIIARYEE parked next to him, exited his vehicle and entered UCE-2's vehicle. NIIARYEE handed UCE-2 a prescription bottle containing 149 oxycodone tablets (30 mg) and UCE-2 counted out $1,800 and handed the money to NIIARYEE. NIIARYEE was taken into custody by the Fairfax Street Crimes Unit at that time. NIIARYEE was released on a personal recognizance bond on or about June 16, 2015.

## VIRGINIA PRESCRIPTION MONITORING PROGRAM

18. On or about September 25, 2015 your affiant reviewed a Virginia Prescription Monitoring Program Patient History Report which detailed the controlled substances obtained by NIIARYEE from Virginia medical providers from January 2007 until that date. From February 2009 until August 2010, NIIARYEE received an aggregate of 1,140 OxyContin 80mg tablets (a total of 91,200 mg). From August 2010 to May 2015, NIIARYEE received an aggregate of 6,765 OxyContin 30mg tablets.

19. As documented by the Food and Drug Administration and the National Association of Boards of Pharmacy, the FDA approved the new formula OxyContin pills in April 2010 and began releasing them for sale in August 2010. These dates coincide with the time frame when NIAARYEE stopped getting a prescription for OxyContin 80 mg tablets and began getting oxycodone 30 mg tablets prescribed to him, as discussed in paragraph 11 above.

## IV. IDENTIFICATION

20. Your affiant has identified SAMUEL DENNIS NIIARYEE by his Virginia DMV driver's license/identification card photo on file as well as his booking photographs from his arrests in Fairfax County, Virginia. Additionally the biographical information located in NIIARYEE'S DMV file, his booking information, and the Virginia Prescription Monitoring Program are all identical.

*-- The remainder of this page is intentionally left blank --*

## V. CONCLUSION

21. Based upon the foregoing, there is probable cause to believe that beginning in or about early 2009, within the Eastern District of Virginia and elsewhere, defendant SAMUEL DENNIS NIIARYEE, knowingly, intentionally, and unlawfully conspired with others to distribute a mixture or substance containing a detectable amount of oxycodone, also known as "OxyContin," "Oxy," "Roxicodone" and "Roxi," a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846

22. Wherefore, I respectfully request that a warrant be issued for the arrest of SAMUEL NIIARYEE, based on the probable cause set forth herein.

Charles B. Doughty
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this 9th day of December 2015.

/s/
John F. Anderson
The Honorable John F. Anderson
United States Magistrate Judge